**STATE of Missouri, Respondent,**

v.

**Rose M. CAMERER, Appellant.**

No. 23504.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 30, 2000.

Rosalynn Koch, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Stacy L. Anderson, Asst. Atty. Gen., Jefferson City, for Respondent.

CROW, Judge.

A jury found Appellant guilty of possessing pseudoephedrine with intent to convert it to create methamphetamine, a controlled substance. § 195.420, RSMo 1994.[1]  The trial court entered judgment

1. Section 195.420.1, RSMo 1994, reads, in     pertinent part:

per the verdict, sentencing Appellant as a prior and persistent offender[2] to four years' imprisonment. This appeal followed.

Appellant's sole claim of error is that the evidence was insufficient to support the verdict. In adjudicating that issue, this court accepts as true all of the evidence favorable to the State, including all favorable inferences drawn therefrom, and disregards all evidence and inferences to the contrary. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). This court's review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found Appellant guilty beyond a reasonable doubt. *Id.*

Viewed in accordance with the second sentence of the preceding paragraph, the evidence established that about 2:55 a.m., May 30, 1998, Douglas Browning, a patrol officer of the Greene County Sheriff's Department, was westbound in a "marked patrol vehicle" on U.S. Highway 266 where it passes over Interstate Highway 44. At that time, Browning saw an eastbound Toyota pickup on Highway 266 "driving very slowly, possibly having vehicular problems." He estimated its speed at five miles per hour or slower.

The pickup and Browning's vehicle passed each other on the overpass. Describing what occurred next, Browning related: "I proceeded on westbound to where I could make a u-turn around the median.[3] And I did that and came up

behind the [pickup] to see if I could render some assistance to [it]."

The pickup was still on the overpass when Browning overtook it. He followed it at an interval of "fifteen, twenty yards" without illuminating the "overhead lights" on his vehicle. The pickup continued east in a "straight line," its speed unchanged.

Immediately after the pickup reached the end of the overpass, Browning saw "a large dark object being thrown out of the passenger side window." His testimony:

"Q. ... Could you describe how that object came out of the [pickup] window?

A. As if it was tossed out the window.

Q. What made you think that?

A. It went approximately ten feet off the roadway.

. . . .

Q. Did it have any kind of an arc on it? Did it go out in a straight line?

A. It was just an arch coming out of the window. It wasn't a real hard throw."

The object landed in a "grassy area ... right at the end of the bridge railing where it comes back down to the ground." Asked where the object would have landed had it been jettisoned sooner, Browning responded, "[I]f it had been tossed over the overpass it would have landed on I–44."

Browning immediately "activated [his vehicle's] overhead lighting." The pickup proceeded approximately twenty-five yards

---

"It is unlawful for any person to possess chemicals listed in subsection 2 of section 195.400 with the intent to ... convert ... that chemical to create a controlled substance ... in violation of sections 195.005 to 195.425."
Section 195.400.2, RSMo Cum.Supp.1997, reads, in pertinent part:
"...
(20) Pseudoephedrine...."
Section 195.017.4, RSMo Cum.Supp.1997, reads, in pertinent part:
"The controlled substances listed in this subsection are included in Schedule II:

...
(3) Any material, compound, mixture, or preparation which contains any quantity of the following substances having a stimulant effect on the central nervous system:
...
(b) Methamphetamine...."

**2.** Section 558.016, RSMo 1994.

**3.** Browning explained: "[T]here's a raised median that goes across the bridge there."

farther east without changing its speed or swerving. Then, it stopped.

Browning exited his vehicle and approached the pickup. Inside were "a male subject driver and a female subject passenger."

Browning asked the duo for identification. The driver was Gifford Isbell; the passenger was Appellant.

Browning estimated the inside width of the pickup "from the driver's side all the way over to the passenger side" as between "four [and] four and a half feet."

Isbell told Browning he (Isbell) "believed he was having fuel pump problems."

Browning called for "backup" because he "needed to ascertain what was thrown from the [pickup] and ... wished another officer to stay by the subjects while I went back there." Lieutenant Ted Haun arrived in approximately five minutes.

Upon Haun's arrival, Browning retreated to the area where he had seen the object tossed from the pickup. There, he found "a black backpack." He found no other object that size in the vicinity.

Browning carried the backpack to Haun's patrol car and opened it. Inside, he found a "bed sheet." Inside the sheet he found a plastic "shopping bag." Inside the bag he found a "pickle type jar."

Browning loosened the jar lid and detected a strong "ammonia odor" that "literally took [his] breath away."

Inside the jar was an inch or an inch and a half of liquid. Beneath the liquid, in the bottom of the jar, was "an inch or so" of "bluish-green substance." Browning recognized the ammonia odor and the substance in the jar as being "consistent with ... the manufacture of methamphetamine."

Browning placed Appellant in custody, then searched the pickup. On "the passenger side floorboard" he found a used "diabetic type syringe" with a "slight trace of [wet] substance in it." The syringe was "directly near where [Appellant's] feet would have been."

At trial, a "narcotics investigator" with the Greene County Sheriff's Department testified methamphetamine sells for approximately $100 per gram in Greene County. The investigator also testified that common insulin syringes are used to inject illicit drugs, including methamphetamine, in liquid form.

A criminalist assigned to the "Missouri State Highway Patrol Troop D Satellite Lab" in Springfield testified the substance in the jar found by Browning weighed 105.33 grams. A strong odor consistent with anhydrous ammonia emanated from the substance.

The criminalist performed a "battery of tests" on the substance; the tests established the substance contained pseudoephedrine. The criminalist explained how pseudoephedrine and anhydrous ammonia are used to manufacture methamphetamine. One gram of pseudoephedrine normally yields one gram of methamphetamine. According to the criminalist, there is no "legitimate purpose" for mixing pseudoephedrine with anhydrous ammonia, hence anyone doing so would be trying to make methamphetamine.

Tests by the criminalist on the syringe found by Browning in the pickup were inconclusive "because of lack of material."

Appellant presented no evidence.

The trial court denied a motion by Appellant for judgment of acquittal at the close of the evidence.

Appellant's sole point relied on reads:

"The trial court erred in denying Rose's motion for judgment of acquittal and in entering judgment of conviction on the jury's verdict ... because the evidence was insufficient to prove guilt of possessing pseudoephredrine [sic] with intent to manufacture a controlled substance, in that the evidence failed to establish beyond a reasonable doubt that Rose possessed the pseudoephredrine

[sic] since the only evidence shown was that it had been in Mr. Isbell's truck, in which Rose was a passenger, and had been thrown out by someone in the truck, and it was complete speculation as to which of them threw the substance out of the truck."

As this court understands the point, Appellant does not claim the evidence was insufficient to support a finding that *someone* in the pickup possessed pseudoephedrine with intent to convert it to create methamphetamine; instead, Appellant maintains the evidence was insufficient to support a finding that *she* was the one who possessed pseudoephedrine with intent to convert it to create methamphetamine.

Appellant emphasizes the following segment of Browning's testimony:

"Q. And you certainly can't say who among the people that were riding in this truck may have tossed this object out if it was, in fact, tossed, is that correct?

A. That's correct."

Based on that testimony, Appellant argues: "The evidence ... showed that both Rose and the driver were in the truck, with no evidence connecting the substance to her, and either one of them could [have] thrown the backpack out."

A person has actual possession of a substance if he or she has the substance on his or her person or within easy reach and convenient control. § 195.010(32), RSMo Cum.Supp.1997. Obviously, if the evidence was sufficient to support a finding that Appellant was the person who tossed the backpack from the pickup, the evidence was sufficient to support a finding that she had the backpack within easy reach and convenient control.

However, Appellant asserts—and the State concedes—that in order to support a guilty verdict, the evidence also had to be sufficient to support a finding that Appellant was aware of the presence and nature of the substance in the backpack. *State v.*

*Purlee,* 839 S.W.2d 584, 587[3] (Mo. banc 1992).

■ Both possession and knowledge may be proved by circumstantial evidence. *Id.*

■ This court holds the evidence sufficient to support a finding that Appellant tossed the backpack from the pickup.

First, the backpack was tossed out of the window on the passenger side. Appellant occupied the passenger seat.

Second, when asked how big the backpack was, Browning answered, "[A]pproximately a foot and a half, two foot, a general size like this." The backpack was received in evidence in the jury's presence, hence the jurors could observe its size and shape.

Third, the backpack landed about ten feet off the roadway, so it was in the air at least ten feet after passing through the pickup window. The jurors could have reasonably inferred that had Isbell tossed the backpack, he would have had to do so with one hand while keeping his other hand on the steering wheel, as the pickup did not swerve when the backpack was tossed. Throwing the backpack from the driver's position in the pickup, across the passenger side (with the passenger seat occupied), with one hand, in the dark, with sufficient accuracy to miss the passenger and pass cleanly through the window, coupled with sufficient force to propel the backpack ten feet off the roadway, while keeping the pickup moving in a straight line, would be a remarkable—and unlikely—feat of physical dexterity.

Finally, Browning testified the backpack came out of the pickup window in an "arch." Given the circumstances in the preceding paragraph, the jurors could have reasonably inferred Isbell, from his position, could not have tossed the backpack in an "arch."

■ This court also holds the evidence sufficient to support a finding that Appellant was aware the backpack contained

pseudoephedrine, undergoing conversion to create methamphetamine.

First, tossing the backpack from the pickup after Browning's marked patrol vehicle appeared behind the pickup is consistent with knowledge that possession of the contents of the backpack violated the law. *Cf. State v. Webster,* 754 S.W.2d 12, 12–13 (Mo.App. E.D.1988).

Second, the backpack was tossed from the pickup on the passenger side—the side nearest the edge of the roadway—only after the pickup crossed the overpass above Interstate 44. From those circumstances, the jurors could reasonably infer that the person who discarded the backpack wanted to protect its contents for possible retrieval later. The testimony of the narcotics investigator, coupled with the testimony of the criminalist, indicated the contents had a potential street value of several thousand dollars. As recounted by Browning, had the backpack been tossed out while the pickup was crossing the overpass, the backpack would have landed on Interstate 44, probably breaking the jar and making it impossible to salvage the contents. Had the backpack been tossed out on the driver's side, it would have likely landed in one of the westbound lanes of Highway 266, producing the same result. As it was, the backpack's contents were intact when Browning found the backpack in the grassy area.[4]

Third, the presence of a syringe of the type used to inject illicit drugs, including methamphetamine, on the pickup's floorboard near where Appellant's feet would have been, although not a compelling circumstance by itself, was another factor the jurors could have considered in determining whether Appellant was aware of the contents of the backpack. Appellant had superior access to that area at the time of the stop, an incriminating fact which is not destroyed by the fact that Isbell also had access. *State v. Shinn,* 921 S.W.2d 70, 73 (Mo.App. E.D.1996).

Appellant's claim of error is denied, and the judgment is affirmed.

BARNEY, C.J., and GARRISON, J., concur.

---

4. The prosecutor argued that theory to the jury. The jurors, who returned their verdict 64 minutes after retiring to deliberate, evidently found the argument persuasive.