**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**DANIEL J. MOORE**
Laszynski & Moore
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANDREW FALK**
Deputy Attorney General

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| RICHARD YOUNG, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | ) No. 79A04-1206-CR-310 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Thomas H. Busch, Judge
Cause No. 79D02-1108-FA-15

**June 13, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

Richard Young ("Young") appeals his convictions and sentence for conspiracy to commit dealing in methamphetamine, a Class A felony;[1] and dealing in methamphetamine (manufacturing), a Class A felony.[2]

We affirm.

## ISSUES

1.  Whether the trial court properly denied Young's motion to dismiss pursuant to Indiana Rule of Criminal Procedure 4(B).

2.  Whether the State presented sufficient evidence to sustain Young's conviction for possession of methamphetamine.

3.  Whether Young's sentence is inappropriate.

## FACTS AND PROCEDURAL HISTORY

On January 22, 2011, Young and one of his housemates, James Glaze ("Glaze"), asked Young's girlfriend, Angela Boorom ("Boorom") to drive them in Young's Chrysler 300 to several places in Tippecanoe County, Indiana. After a number of stops, Young asked Boorom to drive him to a rural area. At a certain point, Young told her to stop, and he walked out into a field, carrying nothing with him. After about fifteen minutes, Young came back to the car carrying a Coleman thermos and a clear pitcher. Young got into the car, and the occupants put the windows down due to the smell of anhydrous. Young told

---

[1] Ind. Code § 35-41-5-2; I.C. § 35-48-4-1.1.

[2] I.C. § 35-48-4-1.1

Boorom that they were going to "take [the containers] back to the residence to finish cooking them off." (Tr. 239, 243).

Meanwhile, Indiana State Police Trooper Joseph Winters ("Trooper Winters") was driving North on Interstate 65 in Tippecanoe County when he noticed Young's car sitting northbound on County Road 500 East, parallel to the Interstate, with its lights off. As a result, Trooper Winters exited onto a county road.

As Trooper Winters headed west on a county road, he saw Young's car coming toward him at a reduced speed. When Trooper Winters passed the car, he noticed that its windows were down despite a temperature of only eight degrees. Trooper Winters turned around and attempted to catch up with the car, but Boorom accelerated away from him.

Trooper Winters began to pursue the car and watched as the car ran at least two stop signs. At one point, Trooper Winters' view of the car was blocked by a hill, and at this point Young threw the two containers out the window. As Trooper Winters began to catch up to the car, Glaze jumped out of the car and began to run away. Trooper Winters finally forced Boorom to pull over, and he directed her to get out of the car. Young, who was sitting in the front passenger seat, gave Trooper Winters his Indiana identification card.

Trooper Winters gave Boorom a sobriety test then placed her in the custody of another officer who took her to a Lafayette hospital for a blood draw. Trooper Winters read Young his rights and then noticed that there were drain cleaner bottles, latex gloves,

3

boxes of pseudoephedrine, and ephedrine in the car. Trooper Winters then found chemical resistant gloves.

After finding these items, Trooper Winters suspected that he had found a methamphetamine lab. Accordingly, he arrested Young while Tippecanoe County Sheriff's Deputy Thomas Lehman ("Deputy Lehman") retraced the route that Boorom had taken in her flight from Trooper Winters. In the area where Trooper Winters had lost sight of Young, Trooper Winters and Deputy Lehman found a clear plastic pitcher in the middle of the road and a red Coleman thermos in a ditch. A chemical smell emanated from the thermos, and the pitcher had a pink solution in the bottom of it. In the area, Trooper Winters and Deputy Lehman found other items of drug paraphernalia, including stripped lithium batteries, a box of pseudoephedrine, and a "foilie" (used to ingest methamphetamine) with burn marks on it.

Trooper Ronald Fisher ("Trooper Fisher"), a member of the Lafayette and Peru Meth Lab Teams, arrived at the scene with a meth lab cleanup truck. He first examined the Coleman thermos and confirmed that it contained anhydrous ammonia. He then examined the pitcher, which he believed was the reaction vessel. The contents had "sloshed" up on the side of the pitcher and had not yet settled back down. He confirmed the presence of ammonia and, after performing an acid test he learned that the solution was more base than acid, meaning that the solution was more toward the beginning of the methamphetamine manufacturing process. He then collected a small sample of the

4

solution, leaving "at least ninety percent of the contents . . . still in the vessel," taking just the "small portion that our lab needs to test." (Tr. 182).

Trooper Fisher also field tested the solution, and the solution tested positive for methamphetamine. From the positive methamphetamine test and the positive ammonia test, Trooper Fisher determined that the solution's contents had reacted and turned some of the pseudoephedrine into methamphetamine. Trooper Fisher then packaged the rest of the solution in the reactor vessel for transportation to be destroyed as hazardous material. Trooper Winters submitted the sample of the solution to the Indiana State Police Lowell Laboratory, where a forensic drug chemist subsequently determined that the solution contained a mixture of methamphetamine and pseudoephedrine weighing 4.66 grams.

Trooper Winters took Young to the State Police Post, read him his *Miranda* rights, and asked him what he had been doing. After some dissimulation, Young told Trooper Winters that the items found were a methamphetamine lab that he had stolen, and that he was going to give it to someone else to finish the methamphetamine.

Young then gave Trooper Winters permission to search his home. At the home, Trooper Winters found, among other things, a bag of white powder, a syringe, a spoon with residue, and extensive items of drug paraphernalia. The white powder field tested positive for methamphetamine, and the police lab later determined that the powder was 2.29 grams of methamphetamine.

Boorom testified that the home's garage was used as a methamphetamine laboratory where Young and Glaze cooked drugs between two to three times per week.

5

Indeed, Young and Glaze cooked a batch of methamphetamine on the night before their encounter with Trooper Winters. Boorom also testified that she had purchased many grams of pseudoephedrine over an extensive amount of time and that Young used the pseudoephedrine in making methamphetamine. Boorom further testified that Young sometimes gave discounts or made trades with customers if they would provide pseudoephedrine for future batches.

On August 15, 2011, the State charged Young with the following counts: conspiracy to commit dealing in methamphetamine; a Class A felony; dealing in methamphetamine (manufacturing), a Class A felony; dealing in methamphetamine (possession with intent to deliver), a Class A felony; possession of methamphetamine, a Class B felony; possession of methamphetamine, a Class C felony; possession with intent to manufacture, a Class D felony; maintaining a common nuisance, a Class D felony; possession of paraphernalia, a Class A misdemeanor; and two counts of unlawful purchase of pseudoephedrine, Class C misdemeanors. The State also filed an habitual substance abuse offender enhancement. At his initial hearing on August 17, 2011, Young requested a public defender, but the magistrate initially declined to appoint one. Young then asked, "Is this when I tell you that I want a fast and speedy trial?" (Supp. Tr. 15). The magistrate responded that Young would need to make a written request before the judge. Young said that he did not think he could hire an attorney, and the magistrate told him that he could make the request himself and that "we'll note that in the record." (Supp. Tr. 15). The magistrate set a trial date of November 26, 2011. The magistrate

6

then decided to appoint a public defender for Young. Before setting Young's bond, the magistrate told Young to tell his public defender that he wanted to file a motion for speedy trial. In his order on the initial hearing, the magistrate noted, "The Defendant orally requests fast and speedy trial and the court directs the defendant to confer with attorney and file written request with court." (App. 28).

On April 5, 2012, Young's public defender filed a motion to dismiss pursuant to Indiana Rule of Criminal Procedure 4(B), explaining that (1) the case was set for April 10, 2012; (2) Young had made an oral request for a speedy trial at the time of the initial hearing and prior to the public defender's appointment; (3) the public defender had not filed a speedy trial request and acquiesced in the setting of the trial date; and (4) Young had requested that the public defender file the motion. (App. 31). The trial court denied the motion.

A jury found Young guilty on all counts and he was subsequently determined to be an habitual substance abuse offender. At the sentencing hearing, the trial court merged the remaining counts into the Class A felony conspiracy to commit dealing in methamphetamine and dealing in methamphetamine (manufacturing) counts. The trial court imposed concurrent thirty-five year sentences and enhanced the dealing in methamphetamine conviction by eight years due to the habitual substance abuse determination. The trial court suspended three years to probation.

## DISCUSSION AND DECISION

1. Indiana Rule of Criminal Procedure 4(B)

Young contends that the trial court erred in denying his April 5, 2012 motion to dismiss pursuant to Indiana Rule of Criminal Procedure 4(B). We review *de novo* a trial court's denial of a motion to discharge a defendant. *Fletcher v. State*, 959 N.E.2d 922, 924 (Ind. Ct. App. 2012). "'The Sixth Amendment to the United States Constitution and Article 1, section 12 of the Indiana Constitution guarantee the right to a speedy trial. The provisions of Ind. Criminal Rule 4 implement these protections.'" *Id.* (quoting *Wilkins v. State*, 901 N.E.2d 535, 537 (Ind. Ct. App. 2009) (citing *Clark v. State*, 659 N.E.2d 548, 551 (Ind. 1995)), *trans. denied*. The pertinent part of the rule provides:

> If any defendant held in jail on an indictment or an affidavit shall move for an early trial, he shall be discharged if not brought to trial within seventy (70) calendar days from the date of such motion, except where a continuance within said period is had on his motion, or the delay is otherwise caused by his act, or where there was not sufficient time to try him during such seventy (70) calendar days because of congestion of the court calendar.

"The purpose served by Crim. R. 4(B) is to prevent a defendant from being detained in jail from more than 70 days after requesting an early trial." *Fletcher*, 959 N.E.2d at 925 (quoting *Williams v. State*, 631 N.E.2d 485, 486 (Ind. 1994)).

"The onus is on the State, not the defendant, to expedite prosecution." *Id.* (quoting *Jackson v. State*, 663 N.E.2d 766, 769 (Ind. 1996)). However, a movant for an early trial must maintain a position which is reasonably consistent with the request that he has made. *Id.* Accordingly, the defendant must object at the earliest opportunity when his trial date is scheduled beyond the time limits prescribed by the rule. *Id.* "A defendant who permits the court, without objection, to set a trial date outside the 70-day limit is

8

considered to have waived any speedy trial request." *Id.* (quoting *Stephenson v. State*, 742 N.E.2d 463, 488 (Ind. 2001), *cert. denied*, 554 U.S. 1105 (2002)). A defendant's obligation to call to the trial court's attention a trial date which has been set outside the time frame allowed by Indiana Rule of Criminal Procedure 4(B) is recognized because the purpose of the rule is to assure early trials, not discharge defendants. *Townsend v. State*, 673 N.E.2d 503, 506 (Ind. Ct. App. 1996).

Here, Young did not object when the magistrate set his trial date outside the seventy-day window. In addition, the trial court found that Young failed to object to repeated discussions about continuances or trial settings in the case. Young also took actions inconsistent with seeking a speedy trial, such as requesting to work with the Drug Task Force. Accordingly, Young waived his claim that the trial court violated his right to a speedy trial. *See Wilkins v. State*, 901 N.E.2d 535, 537 (Ind. Ct. App. 2009), *trans. denied*. (holding that Wilkins "acquiesced to the trial setting outside of the seventy-day requirements and thereby abandoned his request for an early trial" where he failed to object to a trial set beyond the seventy-day period), *trans. denied*.

2.    Sufficiency of the Evidence

Indiana Code § 35-48-4-1.1(a)[3] provides that a person who knowingly or intentionally manufactures methamphetamine, pure or adulterated, commits Class B felony dealing in methamphetamine. The offense is a Class A felony if the State proves that the amount of the drug involved weighs three (3) grams or more. I.C. § 35-48-4-1-

---

[3] The statute has been amended, but the amendments do not apply in this case. *See* 2013 Ind. Legis. Serv. P.L. 158-2013.

1(b). Young contends that the State presented insufficient evidence to support his Class A felony dealing in methamphetamine (manufacturing) conviction because it failed to show that the amount of the drug involved weighed three (3) grams or more.

Our standard of review for sufficiency claims is well settled. In reviewing sufficiency of the evidence claims, this court does not reweigh the evidence or assess the credibility of witnesses. *Davis v. State*, 791 N.E.2d 266, 269 (Ind. Ct. App. 2003), *trans. denied*. Not only must the fact-finder determine whom to believe but also what portions of conflicting testimony to believe. *In re J.L.T.*, 712 N.E.2d 7, 11 (Ind. Ct. App. 1999), *trans. denied*. We consider only the evidence most favorable to the judgment, together with all reasonable inferences drawn therefrom. *Davis*, 791 N.E.2d at 269-70. The conviction will be affirmed if there is substantial evidence of probative value to support the conclusion of the trier of fact. *Id*. at 270. Reversal is appropriate "only when reasonable persons would not be able to form inferences as to each material element of the offense." *Alvies v. State*, 905 N.E.2d 57, 61 Ind. Ct. App. 2009).

Here, the State presented evidence that Trooper Fisher examined the pitcher, which he determined was the reaction vessel. Trooper Fisher testified that he took only a "small portion [of the solution in the vessel] that our lab needs to test" and that he left "at least ninety percent of the contents . . . still in the vessel." (Tr. 182). Trooper Fisher also testified that his field test of the solution revealed the presence of methamphetamine and anhydrous. (Tr. 185). From the positive methamphetamine and anhydrous tests, Trooper Fisher could determine that the contents had reacted and had "taken" the

10

pseudoephedrine into methamphetamine. *Id*. Trooper Winters submitted the solution sample to the State Police Laboratory, and the forensic drug chemist determined that the solution contained a combination of methamphetamine and pseudoephedrine weighing 4.66 grams.

The term "manufacture" includes, among other things, production, preparation or processing of a controlled substance. I.C. § 35-48-1-18. The term does not require "that the process be completed or that there actually be a final product before the statute applies." *Traylor v. State*, 817 N.E.2d 611, 619 (In. Ct. App. 2004) (citing *Bush v. State*, 772 N.E.2d 100, 1022 (In. Ct. App. 2002), *trans. denied*. The total weight of the substance, and not merely its pure content, is to be considered in determining whether the weight element of the charged offense has been met. *Hundley v. State*, 951 N.E.2d 575, 583 (Ind. Ct. App. 2011), *trans. denied*.

The solution provided by Trooper Fisher was in the process of changing from an adulterated to a pure form of methamphetamine. The forensic chemist's test established that the total weight of the solution was 4.66 grams, a sufficient amount to prove that Young committed a Class A felony. In addition, Trooper Fisher estimated that the solution sample provided to the State Police Lab was only 10 percent of the total amount of the solution contained in the reaction vessel. Even if Trooper Fisher drastically misjudged the percentage of the sample, the jury could have inferred that the weight of the solution far exceeded three grams.

11

Young points to Judge Vaidik's concurring opinion in *Harmon v. State*, 971 N.E.2d 674, 682-685 (Ind. Ct. App. 2012), *trans. denied*, in support of his argument that the State failed to prove that the solution contained at least three grams of methamphetamine. First, we note that the concurring opinion referred to whether the weight of methamphetamine under the statute includes both the solid methamphetamine and any liquid ingredients that still remain in the partially cooked methamphetamine batch. No liquid ingredients were measured in the instant case; indeed, the forensic drug chemist testified that the lab would not have weighed any liquid ingredients if such were present. Second, as we noted above, the weight of the total amount of solution far exceeded three grams. Finally, we respectfully disagree with Judge Vaidik's conclusions, and we embrace the method of measurement described in the *Hundley* opinion over *dicta* espoused in a concurring opinion.[4] The State presented sufficient evidence to support its claim that the weight of the adulterated methamphetamine was equal to or exceeded three grams. Accordingly, the State presented sufficient evidence to support Young's conviction of the Class A felony of dealing in methamphetamine (manufacturing).[5]

3. Inappropriate Sentence

---

[4] *Harmon* was decided on the basis that the State completely failed to prove the weight of the methamphetamine because its "string of inferences is simply too tenuous to satisfy its burden of proof beyond a reasonable doubt with respect to the weight element of the Class A felony charge." 971 N.E.2d at 682.

[5] Young argues that the State failed to prove sufficient weight to support his conviction of conspiracy to commit dealing in methamphetamine as a Class A felony. Our reasoning in the current issue vitiates Young's argument concerning his conspiracy conviction.

Young contends that the sentence imposed by the trial court is inappropriate in light of the nature of the offenses and his character. He argues that his actions were no greater than those that meet the minimal elements of the offenses. He also argues that his involvement was addiction based rather than profit based.

The revision of a sentence is authorized by the Indiana Constitution through Indiana Appellate Rule 7(B), which provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."[6] In determining the appropriateness of a sentence, a court of review may consider any factors appearing in the record. *Schumann v. State*, 900 N.E.2d 495, 497 (Ind. Ct. App. 2009). The "nature of the offense" portion of the appropriateness review begins with the advisory sentence. *Anglemyer*, 868 N.E.2d at 491; *Richardson v. State*, 906 N.E.2d 241, 247 (Ind. Ct. App. 2009). The "character of the offender" portion of the sentence review refers to general sentencing considerations and the relevant aggravating and mitigating circumstances. *Major v. State*, 873 N.E.2d 1120, 1131 (Ind. Ct. App. 2007), *trans. denied*. A defendant bears the burden of persuading us that his sentence is inappropriate. *Williams v. State*, 891 N.E.2d 621, 633 (Ind. Ct. App. 2008).

Here, Young neglected to provide the pre-sentence report for our review. The pre-sentence report is an invaluable part of the record for the review of a defendant's criminal

---

[6] I.C. § 35-50-2-4 states that a person who commits a Class A felony "shall be imprisoned for a fixed term of between twenty (20) and fifty (50) years, with the advisory sentence being thirty (30) years."

13

history, and we note that the trial court made a number of references to the report in assessing Young's criminal history. Failure to provide the pre-sentence as part of the appellate record results in waiver of the issue on appeal. *Nasser v. State*, 727 N.E.2d 1105, 1110 (Ind. Ct. App. 2000), *trans. denied*. Waiver notwithstanding, we observe that the record supports the trial court's decision.

Regarding the nature of the conspiracy to commit dealing in methamphetamine offense, the record indicates that Young was engaged in an extensive process of manufacturing methamphetamine. In December 2010 and January 2011, Young cooked methamphetamine two or three times a week. He and Boorom avoided computer detection and purchased large amounts of pseudoephedrine. Between December 14, 2010 and January 14, 2011, Young and Boorom made fourteen purchases of pseudoephedrine, totaling 28.08 grams. Glaze and others also purchased pseudoephedrine for Young's methamphetamine manufacturing process. In addition, Young bartered for boxes of pseudoephedrine from his methamphetamine customers. Manufacturing methamphetamine and selling his product was Young's sole source of income.

Additionally, Young's conviction for dealing in methamphetamine (manufacturing) occurred while he was attempting to grow his business by stealing another person's methamphetamine lab. He fled from Trooper Winters and attempted to dispose of the evidence by throwing items out the car window. Furthermore, he initially

lied to Trooper Winters about what he was doing on the night of his arrest. The nature of the offenses does not convince us that the sentence is inappropriate.

Regarding the character of the offender, the trial court stated that Young "has a long history of criminal or delinquent behavior, including doing the same thing sending him to prison in the first place and relating to his other charge." (Tr. 414). At the time he committed the instant offenses, Young was on probation after having been convicted of possession of an illegal substance with intent to deliver. He was also on probation for two other cases at the time he committed the instant offense. Furthermore, Young violated jail rules by assaulting another prisoner while he was awaiting sentencing in this matter. The trial court recognized both Young's drug problem and his difficult childhood but concluded that Young was "still responsible as an adult for [his] crimes and they are serious ones." (Tr. 415-16). The court also commented, "This is a pretty big cooking operation . . . and you are the cook. Sometimes people say well, all I was doing was buying drugs for my own use, but in this particular case the evidence is that you are the center of this particular ring . . . ." (Tr. 416).

The nature of the offenses and the character of the offender do not convince us that the sentence imposed is inappropriate.

Affirmed.

ROBB, C.J., and MAY, J., concur.

15